ARNOLD H. EATON AND BARBARA A. EATON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Eaton v. Commissioner
Docket No. 3648-75.
United States Tax Court
T.C. Memo 1977-79; 1977 Tax Ct. Memo LEXIS 359; 36 T.C.M. (CCH) 354; T.C.M. (RIA) 770079; March 24, 1977, Filed James J. Damis, for the petitioners. Jan R. Pierce, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined a deficiency of $13,665 in petitioners' Federal income tax for the calendar year 1971. We must decide (1) whether the $70,192.93 petitioners received from one John Henho on May 9, 1971, is excludible from their gross income as the proceeds of a gift under section 102, Internal Revenue Code of 1954, [1] and (2) whether petitioners are entitled to a theft loss deduction *360 under section 165 for any portion of items worth more than $26,000 which purportedly were stolen from their residence during the course of a burglary on or about January 5, 1971. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and attached exhibits are incorporated herein by this reference. Arnold H. Eaton and Barbara A. Eaton, formerly husband and wife, each resided in the State of Oregon when their petition was filed herein. They previously had filed a joint Federal income tax return for calendar year 1971 with the Internal Revenue Service Center at Ogden, Utah. That return was prepared by using the cash receipts and disbursements method of accounting. Since Arnold H. Eaton played a minor role in the sequence of events predating the controversy in issue, Barbara A. Eaton alone will hereinafter be referred to as petitioner. Petitioner grew up in Portland, Oregon as the eldest daughter among seven children of a construction worker. Due to her father's excessive drinking habit, *361 the family lived in an impoverished state. During 1963 several members of the family met a benevolent older man named John Henho. Petitioner was 12 years old at that time while Henho was approximately 70 years old. John Henho appears to have been a lonely man without a wife, children or close relatives. Indeed, Henho's only known living relative was a sister, Sylvia Saaristo, who resided some distance away in the State of Washington. Communications between brother and sister were infrequent, and usually were accomplished through the mails. Little is known about either Henho's early years or his activities during the year in issue that did not involve petitioner's family or husband. He was of Finnish origin, spoke with a heavy accent, and had poor penmanship. Henho was a man of some wealth in 1963. The origin of that wealth is unknown, as is his prior occupation, but during the years subsequent to 1963 his income was derived solely from Social Security payments and his financial operations in the securities markets. Most of his assets were kept in a checking account at the Bank of California, a brokerage account at Merrill, Lynch, Pierce, Fenner and Smith, Inc., and perhaps *362 in a small bank account in the State of Washington. Henho lived alone at the Washington Hotel which was within a short walking distance of petitioner's family residence. Throughout the early portion of these years Henho apparently was in reasonably good health for a man of his age. During the latter years he suffered from the ravages of cancer and tuberculosis. The record is barren of competent medical evidence concerning the degree of physical illness he suffered during any one portion of this period. John Henho befriended petitioner's family from 1963 until some time shortly before his death in 1972. His generosity initially took the form of small presents of cash, clothing, food, and utility payments, and also his constant companionship for the children. Although those initial presents were distributed almost equally between the members of petitioner's family, Henho developed a special interest in petitioner and her younger sister which ultimately caused him to bestow a disproportionate share of his presents upon petitioner. The first of such gifts was made in 1967 when petitioner, then 17, was to graduate from high school. At that time Henho purchased for her a new 1967 *363 Pontiac Tempest automobile. During the next three years Henho purchased at least 4 additional new or used automobiles for petitioner, or for her new husband who had wrecked at least one of petitioner's gift automobiles. Once Henho gave petitioner's sister an undetermined amount of money and also purchased a bedroom set of furniture for her. The year 1970 was an eventful one for petitioner because at some point therein her son was born, John Henho gave her $1,000 in cash for medical expenses associated with the birth of her son, her parents died, and late in the year Henho gave petitioner various cashier's checks totaling at least $26,000 with which to purchase a home. She cashed those checks prior to January 5, 1971, and instead of depositing the money in either her bank or some other financial institution, kept it ensconced in a steel box in a closet of her residence. In March of 1971 John Henho was admitted to the Multnomah County Hospital and, one week later, was transferred to the Oregon TB Hospital for surgery. He was to spend the remainder of his life, until July 3, 1972, in either hospitals or nursing homes. Henho suffered physically from tuberculosis and cancer, *364 and was regarded by all who knew him during this period as "not well." His mental condition, which had begun to deteriorate prior to the year in issue, was unstable at best at all times relevant to this proceeding and fluctuated rapidly between periods of lucidity and irrationality. Although he often could not remember certain events that had recently occurred, his demeanor was usually positive and straightforward at any one point in time. When Erling J. Hangerud, a longtime acquaintance of Henho's, became aware of his specific condition he initiated proceedings that culminated in the establishment of a conservatorship for Henho in October of 1971. Hangerud, an attorney, was convinced that Henho's financial interests needed protection at that time. Shortly thereafter, Hangerud prepared a will for Henho at Henho's request. That will made no reference to Henho's mental condition. Throughout 1971 petitioner visited Henho regularly at the hospital or nursing home in which he was confined. Also during this period she began to assist Henho with his financial dealings. At one point prior to May 1971 Henho granted petitioner the power to manage his brokerage account at Merrill, Lynch, *365 Pierce, Fenner & Smith--including the power to sell securities from the account. Pursuant to that authority, petitioner wrote a letter to Henho's stockbroker, Christopher Strahan, requesting that Henho's account be liquidated and that a check be issued for the net proceeds of sale. Henho signed that letter in the wrong place. After visiting Henho at the hospital, Strahan reduced his brokerage account to cash and issued a check for that balance to his bank account at the Bank of California. Petitioner next wrote the Bank of California directing that Henho's entire bank account be liquidated and that the balance be transferred to him in the form of a cashier's check. The Portland office of the Bank of California complied with those instructions on May 7, 1971, by issuing to "John Henho" a cashier's check in the amount of $70,192.93. On or about May 9, 1971, Henho endorsed that cashier's check by signing his name on the back thereof and transferred possession of the check to petitioner. Henho asked petitioner to see that his present and future medical bills would be paid since he was not covered by medical insurance.Three days later, on May 12, 1971, Henho was admitted to the *366 University of Oregon Medical Center from the Oregon TB Hospital for surgery, where the hospital let him sign his own operative permit. He remained in the care of that institution until May 18, 1971, when he was transferred back to the Oregon TB Hospital. Petitioner encountered some difficulty when she attempted to negotiate the cashier's check because of Henho's badly scrawled signature. In order to correct that situation she visited Henho at the University of Oregon Medical Center where he signed the check again in the presence of two nurses, Mary Summersett and Rosemary Westphal. Each nurse then signed the check as a witness to John Henho's signature alone, without knowing the amount of the check. Petitioner then deposited Henho's check in her joint checking account at the First National Bank of Oregon on May 17, 1971.Once that check was paid out by Henho's bank, he was left destitute for all practical purposes. Henho was visited regularly by petitioner at his various places of confinement after the transfer in issue was completed. In October 1971, Erling J. Hangerud, alarmed over Henho's occasional inability to understand that he had given all of his money away, caused *367 a conservatorship to be established for Henho's financial affairs under Oregon law. The purposes underlying the appointment of that conservator for an apparently depleted estate were to protect any remaining assets and to attempt the recovery of certain transferred assets. Hangerud later drafted a will for Henho, at Henho's insistence, in December 1971 which directed that his estate be distributed to his sister, Sylvia Saaristo, upon his death. Henho appears to have been particularly confused during this period because at times he denied giving all of his money away to petitioner while, on at least one other occasion, he asked Hangerud to recover whatever portion he could of the $70,192.93 in issue. Petitioner and her husband Arnold disposed of the $70,192.93 quickly after receipt. Approximately $1,000 was used to pay a small portion of Henho's outstanding medical bills. Little is known of the other details surrounding that disposition except that petitioner gave a substantial portion of the money to Arnold at the time they separated prior to their divorce. Their joint checking account at the First National Bank of Oregon had ending balances of $71,612.86 on May 24, 1971, $4,794.56 *368 on June 22, $3,731.55 on July 23, $3,077.88 on August 23, $2,255.96 on September 23, $983.80 on October 22, and $1.00 on November 22 and December 22, 1971. John Henho died on July 3, 1972, at a time when he or his estate owed creditors much more money than the estate contained. He owed $3,542.55 to the State of Oregon Department of Institutional Reimbursement, $2,018.82 to Columbia View Hospital, and $746.88 to the Knapp-Gunderson Chapel. Within a short time after his death, Henho's estate initiated an action in the Multnomah County Circuit Court for the State of Oregon against petitioner and her husband for the recovery of $70,192.93. That case was tried before the court without a jury on January 29, 1973. The issue presented therein was identical to the principal question raised here--did John Henho's transfer of $70,192.93 to Barbara Eaton on or about May 9, 1971, constitute a legally cognizable gift to her in that amount? After hearing all of the evidence and weighing the various testimonies, the trial Court ruled that there was a failure of gift because the purported donor lacked the requisite mental capacity to make a gift. A decision was entered against petitioner and *369 her husband in the amount of $70,192.93 to reflect that conclusion. ULTIMATE FINDINGS OF FACT 1. The $70,192.93 which John Henho transferred to petitioner on or about May 9, 1971, is not excludable from her gross income as the proceeds of a gift under section 102 of the Code because the donor lacked the requisite mental capacity to make a gift within the meaning of that section. 2. Petitioner is not entitled to a theft loss deduction in any amount under section 165 with respect to a purported burglary on or about January 5, 1971, because it has not been established by a preponderance of the evidence that such an event ever occurred. OPINION Since the issues presented for decision are entirely factual in nature, we note at the outset that the burden of proof is on the petitioner. Rule 142, Tax Court Rules of Practice and Procedure. This procedural element is of particular significance herein because most of the proffered evidence consisted of the essentially uncorroborated testimony of a handful of witnesses. Several factors conjoined to frustrate our inquiry into these matters. *370 Initially, it became apparent that the one person who could possibly have shed some light upon the matters at hand, John Henho, died prior to the time petitioner was even required to file a Federal income tax return for the year in issue. The decedent's lifestyle during his latter years did not admit a wide circle of friends, and thus corroboration of the witnesses' testimonies was difficult, if not impossible. Moreover, the closest friend or acquaintance of Henho who testified at trial was the petitioner--someone with a sizable financial interest in the outcome of these proceedings. Perhaps the greatest source of frustration was the conflicting and somewhat intriguing versions we received of what transpired on May 9, 1971, when the decedent transferred $70,192.93 to petitioner. Neither version has been documented to our satisfaction, yet each received some support from the stipulated facts. It is under these circumstances that the significant uncertainties begin to weigh heavily against petitioner--the party who must sustain the burden of proof. We have the responsibility of determining what did transpire on May 9, 1971, regardless of whether we have all of the information *371 that we might desire. Although we cannot act with absolute certainty here, we feel constrained to uphold respondent's determination that John Henho lackedt the requisite mental capacity to make a gift when he transferred a check for $70,192.93 to petitioner, and therefore that her gross income for taxable year 1971 was understated by that amount because she did not receive a legally cognizable gift. Section 102(a) of the Code provides in pertinent part that "Gross income does not include the value of property acquired by gift…." It is axiomatic that the legal elements of a gift include an intention to give on the part of the donor, a transfer of title or delivery, and a corresponding acceptance by the donee.See, e.g., Estate of David R. Daly,3 B.T.A. 1042, 1044 (1926). We are concerned with whether John Henho possessed sufficient mental competence on or about May 9, 1971, to form an intention to make a gift. We find that he did not have that ability, and probably did not understand the nature of the transfer effected by him. No competent medical evidence concerning *372 John Henho's mental condition was presented to this Court. Indeed, only a handful of laymen were called upon to render an opinion as to his state of mind. Each party attempted to prove its assertions by establishing certain facts which could lead us to conclude that Henho either was or was not competent on that date. Petitioner contends that because Henho had a history of giving gifts to members of her family prior to May of 1971, the transfer in issue was in fact made, petitioner accepted the transferred assets, and third parties dealt with Henho at arm's-length during that period, we must find that Henho was competent for our purposes. Petitioner relies heavily upon her own testimony as to Henho's benevolent nature, his state of mind, and his unusually strong paternalistic feelings for her. According to her testimony, Henho's "gift" was virtually a testamentary disposition of remaining assets by a man who knew that he had only a short time to live. Respondent counters those assertions by questioning whether, on the basis of Erling J. Hangerud's testimony in opposition and a State court ruling that Henho was incapable of making a gift, we can find that Henho was competent. *373 Respondent's position is predicated in part upon the vagarities and inconsistencies found among petitioner's statements, and in part upon an ulterior motive that he believes petitioner entertained. Essentially, respondent deems petitioner an incredible witness, and believes that petitioner and her husband collaborated to persuade Henho to transfer his remaining funds to them in an unofficial trust so that they could apply them for his care. It is believed that they then misappropriated the money by converting it to their own uses. Petitioner asserts in defense that their virtually unexplained disposition of that money evidences not an illegal ulterior motive underlying their relationship with Henho, but rather another example of their continuing inability to exercise sound financial management. Our holding is not premised to any degree upon a belief that petitioner, either alone or in conjunction with others, wrongfully enticed Henho to transfer his remaining funds to her and then misappropriated them. A conclusion of that nature would prohibit us from finding that funds equal to Henho's unpaid medical bills at the time of his death were the object of a "gift" because petitioner *374 testified that she received the entire $70,192.93 from Henho only on the condition that those bills be paid out of the transferred money. Other suspicions may exist, but without more evidence to support them they cannot be entertained. Two factors convince us that we are correct in holding that John Henho lacked the requisite mental capacity to make a gift. In the first place, we simply cannot accept petitioner's testimony regarding Henho's mental condition in May of 1971. Her uncorroborated testimony was self-serving throughout the trial, inconsistent on several points, and unduly vague concerning several key facts.It is clear that petitioner wanted the money and felt that she was more entitled to it than was Sylvia Saaristo, Henho's sister. We are unable to ascertain from more objective sources, however, what Henho wanted to do with his money. Petitioner claims that she was favored by Henho even over other members of her family. Henho had few close friends. Prior to the date of transfer petitioner became intimately involved with Henho's financial affairs and presumably could have influenced his decisions. Despite the fact that he once was a prudent financial operator, had *375 known attorneys for years, and knew that he was in failing health long before his death, Henho never caused a will to be drawn prior to the date of the transfer in issue. Petitioner, not Henho, wrote the letters to Henho's stockbroker and bank which initiated the liquidation of his assets. She simply was too close to Henho and stood to benefit too much from the ultimate transfer for us to assign much weight to her testimony concerning his desires. Perhaps her testimony would fare better if there were no substantial testimony offered in opposition or if her position as to the alleged sequence of events were not so unusual.
We are asked to believe that a poor family of eight (not counting the father) fortuitously met a benevolent older man with only one living relative whom he did not like. As the story unfolds the older man (Henho) begins to make an increasingly frequent series of small gifts to the family members. As time passes the older man singles out one child (petitioner) to receive a disproportionate share of his gifts--for no apparent reason. The size of these gifts grows until three alleged gifts are made to the favored child totaling approximately $110,000 [2] within *376 a six month span. The practical effect of those "gifts" is to render the transferor (Henho) destitute, hospital bound, and in debt to various creditors. Despite the fact that Henho once was a man of some financial insight, he allegedly never made a will, placed no restrictions on the money transferred to insure that it would not be squandered by an individual without any financial acumen, and transferred all of his hard earned money at a time when he was otherwise without even insurance. This is indeed an unusual story, although truth can be stranger than fiction. The problem is that respondent's theory also contains some vitality. The testimony of Erling J. Hangerud is plausible, and several of petitioner's evidentiary points pertaining to evaluations of Henho's mental condition by third parties are not persuasive. Aside *377 from his theory of wrongful conversion that was mentioned above, respondent asserts that Henho's mental capacity was not only rapidly deteriorating prior to and during 1971, but also that Henho suffered from alternating periods of lucidity and irrationality during 1971. The testimony of Erling J. Hangerud was significant on these points. Hangerud was an attorney who had known Henho at least casually for many years. He has no known financial interest in the outcome of this case. Hangerud testified that during the latter portion of 1971 Henho repeatedly denied having given his money to petitioner. Once Hangerud managed to convince Henho that he was penniless, Henho asked Hangerud to recover what he could of the money. Henho later requested that Hangerud draw up a will leaving his estate to Sylvia Saaristo. We can see no reason why this would have been done if Henho truly believed that nothing remained for disposition upon his death. The establishment of a conservatorship under State law to manage Henho's financial affairs in late 1971 represents the only objective evidence in the record that some independent third party believed that Henho's mental capacity was unstable. This *378 action, in combination with the testimony of Rosemary Westphal, a nurse at the University of Oregon Medical School Hospital at the time of Henho's admission there, concerning Henho's irrationality and apparent mental weakness, and the recurrent testimony of all others present to the same effect, persuades us that he was mentally incapable of making a gift of the sort alleged by petitioner during May 1971. Again, we have less to work with than we would prefer, but the evidence present in the record suffices to overcome the foundation that petitioner seeks to establish for her unusual story. Petitioner adduced countervailing testimony to the effect that the hospital permitted Henho to sign his own operative permit, his stockbroker liquidated his brokerage account after consultation with him, and his bank permitted petitioner to cash the cashier's check in issue once witnesses were provided to his signature. Neither the proper hospital officers, the stockbroker, nor the appropriate bank officers were called before us where they would have been subject to cross-examination. Petitioner urges us to accept the judgment of competency presumably made by each of these individuals as persuasive *379 evidence of John Henho's mental condition in May 1971. We cannot accept those judgments as necessarily sound. None of the officers arranged a thorough examination for Henho prior to the transfers, yet it is apparent that each entertained doubts, while the hospital knew that Henho was irrational. Simple expedience, absence of other known family members, greed, or any one of a multitude of reasons could have prompted these individuals to perform as they did. Petitioner simply has not met her burden of proof on this point. Respondent determined that a gift was not made, while petitioner has been unable to establish that all of the necessary legal elements of a gift were present. Our conclusion is fortified to some extent by a decision reached by the County of Multnomah Circuit Court of the State of Oregon on April 4, 1973. In that case, captioned Sylvia Saaristo, Executrix of the Estate of John Henho, Deceased, Plaintiff v.Arnold Harry Eaton and Barbara A. Eaton,aka Barbara A. O'Shea, Defendants, Henho's estate sued to recover from the Eatons the same money at issue in this proceeding. The Court found as a fact that: 2. The decedent, John Henho, lacked capacity *380 to make a gift and did not intend to make an unconditional gift to defendants and each of them. It then concluded that "A preponderance of evidence establishes that the decedent, John Henho, did not make a gift to defendant of $70,192.93." A review of the record of those proceedings, which was placed into evidence here in its entirety, assures us that the State Court reached its conclusion on virtually the same evidence that was presented to this Court. The second issue in this case is whether petitioner is entitled to a theft loss deduction pursuant to the provisions of section 165 of the Code for any portion of the items purportedly stolen from her residence during an alleged burglary on or about January 5, 1971. A deduction in the amount of $26,000 was claimed by petitioner in her amended petition in accordance with her testimony to that effect at trial. We are unable to find persuasive evidence in the record that would tend to substantiate such a claim, and therefore, we hold that no deduction is allowable for any portion of the claimed loss. John Henho had given petitioner and her husband various cashier's checks totaling approximately $26,000 during the latter part *381 of 1970. The Eatons cashed those checks and placed the money in a steel box in a closet of their residence. Petitioner testified that the box was last seen on January 5, 1971, when she went to get a small amount of spending money. Both petitioner and her husband were out of town on January 6, 1971.Petitioner testified that when she returned home that night she discovered that it had been burglarized. The police allegedly discovered upon investigation that a television set worth $475, a stereo system, some jewelry, and all of the remaining cash in the steel box had been taken. According to petitioner's testimony, the police theorized that the burglar had entered through her bathroom window and then selectively burglarized the house. Petitioner testified that only she and her husband had known that the cash was in the house, and that no portion of the stolen funds was ever recovered.Apparently no one was ever charged or convicted of this alleged felony. We simply cannot sanction a theft loss deduction within the purview of section 165 solely on the basis of such uncorroborated testimony. Although there was some discussion at trial between opposing counsel concerning the existence *382 or nonexistence of a police record of this burglary, none has been produced. Indeed, it appears from the record that the police cannot find any record of such a burglary report. Without some corroboration we are unwilling to accept petitioner's testimony. The burden of proof rests on petitioner. She has asked us to accept as true a long series of implausible circumstances which seemingly cannot be corroborated by any means. Her only explanation for her failure to deposit such a sum in her bank account was that her husband had become upset with Henho's bank when he attempted to cash one of the cashier's checks. We find it unusual, to say the least, that even someone without better business sense than petitioner would not have made every effort to protect a sum of money greater than any she had ever had or seen before. We note at this time that petitioner has asked us to find that she received a gift of $15,000 in cash from John Henho during March 1971. We did not find that as a fact for the very reasons set forth above with respect to the alleged theft loss. Despite the fact that petitioner did deposit $15,040.94 to her checking account on March 5, 1971, the source of *383 those deposited funds remains a mystery. Petitioner was unsure at trial of either the composition of that deposit or the gift allegedly received from Henho. She could not remember if all of the deposited money had been received from Henho during the course of one transfer. Too much is unclear for us to make a determination in petitioner's favor in either case. For all we know the $15,040.94 deposit could represent part of the money allegedly stolen in January 1971. Accordingly, to reflect the conclusions reached herein, Decision will be entered for the respondent. Footnotes
1. All statutory references pertain to the Internal Revenue Code of 1954, as amended during the year in issue, unless otherwise indicated.↩
2. This $110,000 total consists of $26,000 transferred to petitioner during the latter part of 1970 in the form of various cashiers checks, $15,000 allegedly transferred to petitioner in undetermined form in March 1971, plus the $70,192.93 in issue. We have been unable to find from the record that the alleged $15,000 transfer ever took place as alleged.↩